44600. STOLA v. THE STATE.
(362 SE2d 221)

PER CURIAM.

After plenary consideration of this matter, it is found not to satisfy the criteria for the grant of certiorari and the writ is therefore vacated.

*All the Justices concur, except Smith and Bell, JJ., who dissent.*

SMITH, Justice, dissenting.

Once again I take pen in hand to defend my executed and buried Fourth Amendment friend. As usual to no avail, but nevertheless I write.

While this Country was busy celebrating the 200th anniversary of our Constitution, the Court of Appeals and this Court were burying more deeply the most basic of rights provided by the Fourth Amendment of that great document. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, *shall not be violated,* and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis supplied.) U. S. Const., Art. IV; Ga. Const., Art. I, Sec. I, Par. XIII.

The great difficulty in protecting the Fourth Amendment rights, especially in these days of increasing illicit drug trafficking, is that the Fourth Amendment is generally relied upon by those who are caught with illegal substances. But the Fourth Amendment must not be eroded; it was designed to protect all citizens from unreasonable government intrusion. The United States Supreme Court has uniformly maintained that the guilty are just as entitled as the innocent to the protection, which the Constitution provides *shall not be violated.*

When we allow excision of the Fourth Amendment in what this Court would define as benign cases (after all the defendant was in possession of illicit drugs) the melanoma of lack of personal security will envelop us and we will be no better off than those who live under the constant fear of police searches and seizures based upon nothing more than pure rumor, speculation, and innuendo.

This court granted the writ of certiorari to the Court of Appeals in *Stola v. State,* 182 Ga. App. 502 (356 SE2d 222) (1987), to determine whether there was probable cause for the *warrantless* arrest of Stola.

I do not believe that there was probable cause for Stola's arrest, and I do not believe that *Illinois v. Gates,* 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983) should be stretched beyond its clear meaning to erode our rights. The issue addressed in the *Gates* decision was "the application of the Fourth Amendment to a *magistrate's issuance* of a search warrant on the basis of a partially corroborated anonymous informant's tip." (Emphasis supplied.) Id. at 217. *Gates* was not intended to apply to warrantless arrests and searches based on anony-

mous telephone[1] tips. The *Gates* opinion is replete with references to the preference for the warrant process. Id. at 237-241. In denying Justice Brennan's suggestion in his dissent that the "totality-of-the-circumstances" somehow downgrades the role of the neutral magistrate, the majority stated, "[q]uite the contrary, we believe, is the case. The essential protection of the warrant requirement of the Fourth Amendment, . . . is in 'requiring that (the usual inferences which reasonable men draw from evidence) be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " Id. at 240. As stated by Justice Brennan in his dissent, "[w]e start with the proposition that a neutral and detached *magistrate*, and *not* the *police*, should determine whether there is probable cause to support the issuance of a warrant." Id. at 275. The issue before the court was the standard the *magistrate* was to use, not the standard to be used by police.

I would as a matter of state constitutional law decline to apply *Gates* to cases involving warrantless arrests and searches. This is in line with *People v. Johnson*, 66 NY2d 398 (488 NE2d 439; 497 NY Supp2d 618) (1985), in which the New York Court of Appeals overturned Johnson's conviction for felony murder after ruling that the informant's statements that were used as the basis for Johnson's warrantless arrest were not reliable "under the *Aguilar-Spinelli* rules and we decline to apply *Illinois v. Gates* to warrantless arrests."

Assuming *arguendo* that *Gates* is applicable, the police did not have probable cause to arrest Stola under the following facts: At approximately 12:15 p.m. Officer Hatchat of the DeKalb County Police received a call from a person who wanted to speak with a narcotics agent. The caller was unwilling to give his name but indicated that he had some information for the police. He was also unwilling to divulge his source of information. The caller told Officer Hatchat that there was going to be a white male named Rodney making a delivery of approximately eight pounds of cocaine to a man named Al who lived with Celeste at 714 Willow Creek Drive. The delivery was to occur between 7:00 and 8:00 p.m. Rodney was described as approximately 5'11" tall, 185 pounds, with reddish-brown hair, a mustache and a beard. He was supposed to be wearing a green army jacket and carrying a brown leather briefcase. Rodney was supposed to make the delivery in a black, 1983 or 1984 Porsche Carrera with a whale tail on the rear. Both Rodney and Al were supposed to be armed with .45 caliber automatic pistols.

---

[1] "See also *Adams v. Williams*, supra 407 U. S. at 146, 92 S. Ct., at 1923 (suggesting that an anonymous telephone tip provides a weaker case for a *Terry v. Ohio*, 392 U. S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968), stop than a tip from an informant known to the police who had provided information in the past); . . ." (Justice Brennan, dissenting.) *Gates*, supra at 285.

The DeKalb officer determined that the address was in Fulton, not DeKalb County. He testified that eight pounds is a large amount of cocaine, an amount a smuggler might possess, thus, he called Agent Lang of the Georgia Bureau of Investigation. They agreed to meet at 5:00 p.m. that day to discuss the information and to decide what to do about it. At approximately 1:50 p.m. the informant called for a second time. Officer Hatchat stated that he knew it was the same person who made the first call. The caller went over some of the details of the delivery and stated that the delivery would be made at 3:00 p.m. Officer Hatchat relayed the information to Agent Lang. Officer Hatchat also called the Georgia Power Company and found out that the power bill for apartment 714 was listed under the name of Celeste Hill. Agent Lang told the DeKalb officer to meet him at the Fulton County address. Officer Hatchat and his partner parked their undercover vehicle in a location where they could watch the apartment. Agent Lang and other GBI agents arrived and set up their vehicles in strategic locations so that they could block the suspect vehicle to prevent its escape. While they were waiting a red Toyota pulled up in front of the apartments. A white male exited the automobile and entered apartment 714. The police "ran the tag" and found out that the red Toyota was registered in the name of Celeste Hill. Within 15 minutes the same man exited the apartment and left in the red Toyota. At 4:00 p.m. Officer Hatchat and his partner were still waiting in the parking lot. Agent Lang told Officer Hatchat that "someone at the office received a phone call and said the plans had been changed . . . the vehicle being used was a red Toyota Corolla, and that they were running approximately 45 minutes late." The person driving the red Toyota was supposed to be carrying a brown briefcase. At approximately 5:00 p.m. the red Toyota that was there earlier pulled up in front of the apartment. Officer Hatchat testified that he gave the word to arrest the occupant of the red Toyota when he saw that the occupant had "reached over and grabbed a brown briefcase and held it up."

Officer Hatchat testified that no arrest warrant was obtained because there was no time to get a warrant. (The first call came in at 12:15 and the arrest was made at 5:00 p.m.)

The officials gave conflicting stories of the arrest, and their conflicting stories did not match any of the consistent stories of the witnesses. Officer Hatchat said that from his vantage point approximately 100 yards away he could see in the car and he determined that the occupant had a brown briefcase in his hand. He testified that they got Stola out of the car and arrested him. Officer Hatchat also testified that he saw a corner of a bag with white powder in it in plain view in Stola's car.

Agent Lang testified that Stola exited the car with the brown

briefcase in his hand and he was arrested as he stood at the front of his car.

Three eyewitnesses stated that Stola was pulled from the car, thrown over the back of the car, and handcuffed. After he was handcuffed the police searched the car and pulled a brown briefcase from the "back seat of the car." After Stola was put face down on the ground, with a gun to his head, the officers and agents went into the apartment.

There are also conflicting stories regarding the "consent" search that took place in the apartment. Celeste Stola testified that she was upstairs drying her hair and heard noise downstairs. She thought it was Al because he normally arrived home at that time. Subsequently she saw three badges around the corner of the stairway and heard voices say that they were with the GBI. They held her and her young child at gunpoint. When she was allowed to go downstairs she testified that the apartment was in "shambles." She further testified that she did sign a consent to search form after they had partially searched downstairs and after she was told that they would tear up her house.

The appellant testified that he drove up to the apartment in his car and was rushed by the police. He testified that the briefcase was in the back seat of the car behind the passenger seat, and that he had made no attempt to reach for it before he was forcefully removed from the car. He also testified that there was no half baggy with white residue in the car.

I do not believe that there was probable cause to arrest Stola. All the police had at the moment of arrest was a telephone tip from an unknown informant and innocent behavior on the part of Stola.

The veracity or reliability and the basis of knowledge of the informant are still all highly relevant in determining the value of hearsay information. Rather than looking to them as two distinct prongs, they are to be understood as intertwined requirements. A deficiency in one under the "totality-of-the-circumstances" analysis can be compensated for by a strong showing as to the other, or by some other indicia of reliability. *Gates*, 462 U. S. 213, 234. The *Gates* court provided some examples of the way in which a deficit in one area could be compensated for by a strong showing in the other area, but there is *nothing* in the record before this Court to compensate for the gross deficits in both the veracity and basis of knowledge of the anonymous telephone informant. This case does not fit within any of the examples provided. The informant was not "known for the unusual reliability of his predictions of certain types of criminal activities in a locality, [so that] his failure, in [this case] to thoroughly set forth the basis of his knowledge surely should . . . serve as an absolute bar to a finding of probable cause based on his tip." Id. at 233. The informant

was not "an unquestionably honest citizen [who came] forward with a report of criminal activity — which if fabricated would subject him to criminal liability. . ." Id. He was also not a "firsthand" observer who provided an "explicit and detailed description of alleged wrongdoing." Id. at 234.

The informant or informants[2] in this case refused to give his identity. The informant gave no indication of how he obtained his information.[3] Officer Hatchat testified that the informant indicated that he called in order to seek "revenge." He testified that the informant "stated there was a friend of his named Frank that was killed in an auto accident and it was because of his coke habit and Al and this Rodney had something to do with it." The police, the trial court, the Court of Appeals, and a majority of this Court find that this offers " 'a plausible reason for the unsolicited call.' " *Stola*, supra at 504, and, thus, lends some indicia of reliability to the information. I believe that the reason weakens the reliability of the information. The informant's revenge-filled "motive" was based on nothing more than pure speculation and this is exactly what our constitution is designed to protect us from, unreasonable and unwarranted governmental intrusion in the form of arrests, searches, and seizures based upon pure speculation, innuendo, and rumor.

There is absolutely no way that the tip standing alone would be sufficient, even the Court of Appeals is willing to admit that much. *Stola v. State*, supra at 503. The informant does not fit within any of

---

[2] Officer Hatchat testified that he did not know who the informant was, that he refused to give his name, or source of knowledge. The third call was received by another police officer and the information was relayed to Agent Lang who relayed the information to Officer Hatchat. There is absolutely no way to be certain that the third call was made by the same person who made the first two calls.

[3] Although we cannot consider the events after the arrest in evaluating the probable cause of the arrest or the lack thereof, it is interesting to note that the information provided to the police turned out to be erroneous. Rodney and the fancy black Porsche were never seen. The appellant did not fit the description of Rodney, who had reddish-brown hair, a mustache and a beard. Stola was clean shaven. He did not have a gun, and he did not have possession of 8 pounds of cocaine. He just happened to come home at his regular time, in his wife's car, with his briefcase. The briefcase contained a bag with 112.2 grams of a mixture of a substance containing 10% cocaine. It is also interesting to note that although the Court of Appeals' opinion states, "one officer entered the automobile and saw the corner of a plastic bag containing a white substance resting in plain view on the console. Another officer opened the brown leather briefcase where he found a bag which also contained a white substance. Both substances were tested and found to be cocaine." *Stola*, supra at 503. My search of the record did not disclose the same information. I could find no place in the record where the "corner of a plastic bag" was tested for cocaine. Officer Hatchat testified that he saw a bag, but there was no record of the "corner of a plastic bag" being examined by the state crime laboratory. The district attorney admitted in his closing argument that the corner of the bag had somehow become "lost." I could not find one place in the record where anyone other than Officer Hatchat saw a corner of a bag. It was not examined by the crime lab, and it was not introduced into evidence. A witness who was within approximately 10 feet of the arrest testified that he did not see the officer get a corner of a "baggy" out of the car.

the examples provided by the Court as noted above, thus, we must look to see if the information was corroborated by independent police investigation to such an extent that the information discovered independently supports both the inference that the informer was generally trustworthy and that he based his allegations on information obtained in a reliable manner.

The opinion in *Gates* emphasized that the anonymous letter (the source of the information in that case) had been "corroborated in *major* part" by independent police work. (Emphasis supplied.) *Gates*, 462 U. S. at 244, 247. The Court stated, "[e]ven standing alone, the facts obtained through the independent investigation of [the police] and the DEA at least suggested that the Gateses were involved in drug trafficking." Id. at 243. The Court also stated, "[t]he judge, in deciding to issue the warrant, could have determined that the *modus operandi* of the Gateses had been *substantially corroborated*." (Emphasis supplied.) Id. at 226.

The information in this case was NOT "corroborated in major part" by police investigation. The police only obtained the following information on their own. The electric power at the address where the drug deal was to occur was in the name of Celeste Hill. A red Toyota registered under the name of Celeste Hill was driven to the apartment by a man who did not fit the description of the alleged drug courier. He went into the apartment and exited approximately 15 minutes later. The same red Toyota drove up to the apartment later and police arrested the appellant. The facts obtained through the independent investigation did not in the slightest degree "suggest that the [appellant was] involved in drug trafficking." Id. at 243. No one, not even a highly trained law enforcement agent, could have determined, based on the information available when the arrest was made, that any *"modus operandi* had been substantially corroborated[,]" id. at 227, or that there was anything remotely suggesting "a pattern that trained law enforcement officers have recognized as indicative of illicit drug-dealing activity." Id. at 269. (Justice White concurring.) Agent Lang testified that other than the information from the informant he did NOT "have any information that would corroborate criminal activity [on the part of the appellant]."

This case has done extensive damage to the rights of the citizens of this State. Now a disgruntled spouse, friend, or employee can, without any liability on his part, evoke the full power of the government to harass another person with three simple *anonymous* telephone calls. First a fabricated story about a *large* amount of an illicit substance and a full description of someone who will drive an *expensive* car carrying *automatic weapons*, and a *briefcase*. A later call to excitedly report that the plans for the big drug deal have changed, still a later call to say that the plans have changed again, the drugs

will be in a *briefcase* in another car. The subject of the harassment is then arrested when he arrives home at the *usual* time with his *briefcase*. If the police find any illegal substance, there was probable cause. If they do not find any illegal substance, then the officers simply shrug their shoulders and say, " 'scuse me." There is no recourse for the person subjected to the unreasonable search and seizure that will cure the damage done.

I dissent to the majority of this Court vacating the writ of certiorari in this case.

DECIDED NOVEMBER 25, 1987.

*John A. Nuckolls,* for appellant.
*Lewis R. Slaton, District Attorney, Benjamin H. Oehlert III, Assistant District Attorney,* for appellee.
*Donald F. Samuel,* amicus curiae.